James F. Clark, Alaska Bar #6907025
Law Office of James F. Clark
1109 C Street
Juneau, Alaska 99801
Tel: 907-586-0122
jfclarkiii@gmail.com

Steven W. Silver, Alaska Bar #7606089
Silver Legal Services, LLC
2104 Polo Pointe Drive
Vienna, Virginia 22181
Tel: 703-587-7792
ssilver628@aol.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| GOVERNOR FRANK H. MURKOWSKI, THE SOUTHEAST CONFERENCE, THE CITY OF KETCHIKAN, THE KETCHIKAN GATEWAY BOROUGH (KGB) SOUTHEAST STEVEDORING CORP., ALASKA ELECTRIC LIGHT & POWER COMPANY (AEL&P), ALASKA POWER & TELEPHONE (AP&T), ALASKA MARINE LINES, INC. (AML), HYAK MINING CO., THE ALASKA MINERS' ASSOCIATION (AMA), THE RESOURCE DEVELOPMENT COUNCIL OF ALASKA (RDC), THE ALASKA CHAMBER, THE JUNEAU CHAMBER OF COMMERCE, THE FIRST THINGS FIRST ALASKA FOUNDATION (FTF), TYLER RENTAL INC. (TYLER), FIRST BANK, TEMSCO HELICOPTERS, INC., SAMSON TUG AND BARGE COMPANY, INC., BOYER TOWING INC., COASTAL HELICOPTERS, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 1:23-cv-0010-SLG |

INC., SOUTHEAST ALASKA POWER )
AGENCY, GREATER KETCHIKAN )
CHAMBER OF COMMERCE, ASSOCIATED )
GENERAL CONTACTORS OF ALASKA, AND )
ALASKA BANKERS ASSOCIATION. )
                                              )
                              Plaintiffs. )
         v.                                   )
                                              )
TOM VILSACK, in his official capacity as )
Secretary of Agriculture, UNITED STATES )
DEPARTMENT OF AGRICULTURE, XOCHITL)
SMALL, in her official capacity as Deputy )
Secretary of Agriculture, UNITED STATES )
FOREST SERVICE, and RANDY MOORE, )
in his official capacity as Chief of the )
Forest Service. )
                                              )
                              Defendants. )
_____)

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
**(5 U.S.C. §§ 701-706; 16 U.S.C. §§ 551; 16 U.S.C. § 528 et seq.;16 U.S.C.**
**§ 1608; 42 U.S.C. § 4332; 16 U.S.C. § 3120;16 U.S.C. § 539(d)).**

## INTRODUCTION

1.  a. This action seeks a judgment declaring that by promulgating and

reapplying the 2001 Roadless Area Conservation Final Rule and Record of

Decision  (ROD) to the Tongass National Forest (Tongass), the United

States Department of Agriculture, the United States Forest Service, Tom

Vilsack, in his official capacity as Secretary of Agriculture, Xochitl Torres

Small, in her official capacity as Deputy Secretary of Agriculture,  and

Randy Moore, in his official capacity as Chief of the Forest Service,

(collectively Defendants or USDA), violated the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706; Organic Administration Act, 16 U.S.C. § 551; Multiple Use Sustained Yield Act 16 U.S.C. § 528 *et seq* ; Roads and Trails System 16 U.S.C. § 532; Rights of Way for dams, reservoirs, or water plants for municipal, mining or milling purposes 16 U.S.C. § 524; National Forest Management Act, 16 U.S.C. § 1608; National Environmental Policy Act (NEPA) 42 U.S.C. § 4332; Alaska National Interest Lands Conservation Act (ANILCA) 16 U.S.C. § 3120; Tongass Timber Reform Act 16 U.S.C. § 539(d); 2015 Defense Authorization Act; SAFTEA-LU § 4407[1]. By failing to follow these laws and by applying them to the Tongass in an arbitrary and capricious manner, Defendants have irreparably harmed the Plaintiffs.

b. By passage of ANILCA, TTRA, and the FY 2015 Defense Authorization Act and especially its creation of LUD II Special Management Areas (SMAs)[2] in the TTRA in 1990, prior to Defendants' promulgation of the 2001 Roadless Rule, and before reimposition of the 2001 Roadless Rule on January 27, 2023, Congress has demonstrated its clear and manifest intent that Congress, not the federal agencies, shall make the "lasting" land use

---

[1] Pub. L. No. 109-59 § 4407, 119 Stat. 1144, 1777, as amended by Pub. L. No. 114-94 § 1446(c), 129 Stat. 1312, 1438 ("Section 4407")
[2] Special Management Areas (SMAs) which are to be "managed in a roadless state to retain their wildland character."

designations in the Tongass National Forest necessary to achieve its ANILCA § 101 (d) goal of maintaining a balance between protection and development.

c. These Congressional statutes, especially Congress's creation of LUD II SMAs in the TTRA, show that read individually and together they preempt Defendants purported IRAs for purposes of agency regulation and management of the Tongass National Forest. (See *Sturgeon v. Frost*, 139 S. Ct. 1066 (2019)).

d. By their excessive and unreasonable designation of 9.34 million acres of IRAs (*de facto* LUD II SMAs) for "lasting" unroaded protection, which, when added to Congressional designations, sets aside 90% of the Tongass for "lasting" unroaded protection, Defendants have arbitrarily and capriciously interfered with, and illegally overridden, the foregoing actions taken by Congress's to achieve its ANILCA § 101(d) policy goal of achieving "the appropriate balance between protection and development," all of which violates the APA (5 U.S.C. § 706(2)(C)).

## JURISDICTION AND VENUE

2. This action is brought pursuant to the Administrative Procedure Act, 5 U.S.C. §701 to 706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 and 28 U.S.C. § 1361, and to vacate unlawful agency action

under 5 U.S.C. § 706. The United States has waived sovereign immunity in this type of action in 5 U.S.C. §702.

3. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1361 because this case arises under the Administrative Procedure Act (5 U.S.C. §§ 701 to 706), the Alaska National Interest Lands Conservation Act (ANILCA) of 1980 (as amended) (16 U.S.C § 3101 et seq.), the Wilderness Act (16 U.S.C. § 1131 et seq.), the Tongass Timber Reform Act (TTRA) (16 U.S.C. § 539(d)), the National Forest Management Act (NFMA) (16 U.S.C. §1600 et seq.), the National Environmental Policy Act (NEPA) (42 U.S.C. § 4321 *et seq*.), the Multiple-Use Sustained-Yield Act (MUSYA) (16 U.S.C. § 528 *et seq.),* and the Organic Administration Act (16 U.S.C. § 475).

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(C) because the Defendants are officer, employees, and agencies of the United States and the Tongass National Forest is located within the district. *See also* 5 U.S.C. § 703 ("venue for actions under the Administrative Procedures Act is generally proper in a court of competent jurisdiction").

## PARTIES

**The Plaintiffs**

5. GOVERNOR FRANK H. MURKOWSKI – Governor Murkowski was elected to the United States Senate from Alaska in 1980. He was elected three more times until leaving the Senate in 2002 to become Governor of Alaska.

a. When the Clinton Administration promulgated the Roadless Rule in January 2001, he encouraged then Governor Tony Knowles to challenge application of the 2001 Rule to the National Forests in Alaska because it violated ANILCA's "No More" Clause (§1326 (a)) and because the Rule's Purpose and Need was inconsistent with the two reviews of Roadless Areas in Alaska's National Forests undertaken by Congress in ANILCA and the TTRA. He has followed the status of the application of the 2001 Roadless Rule to the Tongass ever since then.

b. Frank H. Murkowski became Governor of Alaska in 2002. At his direction Alaska settled the litigation with USDA in 2003 based upon the commitment of USDA to engage in Tongass-specific rulemaking. In December 2003 USDA agreed to temporarily exempt the Tongass from the Roadless Rule because "the roadless values on the Tongass are sufficiently protected under the Tongass Forest Plan and the additional restrictions

associated with the roadless rule are not required."[3]   The 2003 Regulation also stated:

> The Department has concluded that the social and economic hardships to Southeast Alaska outweigh the potential long-term ecological benefits because the Tongass Forest plan adequately provides for the ecological sustainability of the Tongass.[4]

c. Governor Murkowski retains his interest in hunting and fishing in Tongass Inventoried Roadless Areas (IRAs).[5] As an older Alaskan, access to such areas by road and other means is necessary for his enjoyment of them.

6. THE SOUTHEAST CONFERENCE – The Southeast Conference is the state and federally designated regional economic development organization for Southeast Alaska. Its mission is to "support activities that promote strong economies, healthy communities, and a quality environment in Southeast." The Southeast Conference has heavily participated throughout the 2001 Rule process from the beginning, including the 2018 - 2020 Alaska-specific Roadless Rule process. The Southeast Conference found that "the process used by the State and Forest Service in Exempting the Tongass

---

[3] 68 Fed. Reg. 75,136 Dec. 30, 2003.
[4] 68 Fed. Reg. 75,136 Dec. 30, 2003.
[5] Inventoried Roadless Areas (IRAs) are United States Forest Service lands that have been identified by government reviews as lands without existing roads suitable for roadless area conservation. Roadless area conservation is a policy limiting road construction on designated areas of public land for environmental and aesthetic reasons. IRAs do not fall within the definition of "Conservation System Unit" set out in ANILCA § 102 (4).

from the Roadless Rule "was methodical, inclusive, by-the-book, and fair." Accordingly, "the Southeast Conference strongly supported the October 29, 2020, Alaska-specific Roadless Rule process and the reasons that process provided for exempting the Tongass from the 2001 Rule." The January 27, 2023, reimposition of the 2001 Roadless Rule on the Tongass will place unnecessary barriers on transportation, hydropower and transmission line development, and mining throughout Southeast Alaska.

7. THE CITY OF KETCHIKAN – Ketchikan Public Utilities (KPU), a wholly owned subsidiary/department of the City of Ketchikan, provides power to Ketchikan. The continued supply of power to Ketchikan is dependent upon its ability to construct hydropower facilities and maintain transmission lines by road instead of helicopter in IRAs. Doing so is impractical and uneconomic without the certainty of road access. Further, reimposition of the 2001 Rule's prohibition of access to geothermal sites constricts the range of renewable energy alternatives available to KPU.

8. SOUTHEAST ALASKA POWER AUTHORITY (SEAPA) - SEAPA is a Joint Action Agency, and Alaska public utility formed and existing under Alaska Statutes §§ 42.45.300 *et seq.* SEAPA owns and operates two hydroelectric projects (Swan Lake and Tyee Lake) and approximately 175 miles of transmission line, which interconnect the towns

of Petersburg, Wrangell, and Ketchikan. The hydroelectric projects and associated transmission facilities provide renewable, non-carbon-based, electric energy and power to SEAPA's three-member Public Utilities - the city of Ketchikan d/b/a KPU, the Borough of Wrangell d/b/a    City of Wrangell Light and Power Department, and the Borough of Petersburg d/b/a Petersburg Municipal Power and Light.

SEAPA's hydroelectric projects and transmission lines are mostly surrounded by IRAs. Because roads are not available to access transmission lines for maintenance, repairs, and unscheduled outages, they must be serviced by helicopter. These helicopter maintenance costs are passed on to the ratepayers and are significant because 1)   maintenance/repairs take longer to perform, and 2) during any outage each member utility must generate more electricity with diesel. Additionally, there are increased safety risks for  SEAPA's employees and contractors.

A hydroelectric project cannot be built using helicopters alone. Hydroelectric plants are major construction projects that require heavy machinery, equipment, and concrete. For example, each generator at Tyee was approximately 30 tons. Moving this equipment by helicopter is not only impractical, but also impossible. Roads to move this type of equipment are necessary. Because the 2001 Roadless Rule inhibits road construction as

well as tree cutting, it is extremely expensive to build hydro projects in or to IRAs. This will severely limit the potential for adding additional hydroelectric facilities. The result will be more generation of electricity by non-renewable and polluting diesel. This has a direct effect on SEAPA, the communities it serves, and the health and well-being of the ratepayers of those communities.

SEAPA's ability to maintain its the existing transmission lines and to develop new hydroelectric facilities in southern southeast Alaska will thus be severely impacted by the January 27, 2023, reimposition of the 2001 Roadless Rule.

9. KETCHIKAN GATEWAY BOROUGH (KGB) – KGB is dependent upon hydropower for energy and for direct and indirect jobs and tax revenue. KGB's citizens' and the ability of others: a) to prospect, explore for, and develop new mines (such as the Bokan Mountain and Ucore Projects); b) to access hydro sites and other renewable energy project sites by road to transport the equipment needed to develop such mineral and hydro sites; and c) for its suppliers of hydroelectric power (KPU and SEAPA) to reduce costs to KGB and its citizen-ratepayers by maintaining transmission lines by road instead of helicopter will be severely constrained,

if not prohibited, by the January 27, 2023, reimposition of the 2001 Roadless Rule to the Tongass.

10. ALASKA BANKERS ASSOCIATION – The Alaska Bankers Association's members have customers and employees who live and work in or adjacent to the Tongass National Forest for business and economic purposes such as mining, timber harvest, construction of facilities needed to provide hydropower and other renewable energy opportunities and for recreational purposes such as hiking, camping, and sport hunting, and fishing. Accordingly, the Alaska Bankers Association's interests will be adversely affected by reimposition of the 2001 Rule.

11. SOUTHEAST STEVEDORING CORP – Southeast Stevedoring performs ship loading services at port locations throughout Southeast Alaska for the renewable energy, mining, and timber industries in Southeast Alaska. The January 27, 2023, reimposition of the 2001 Roadless Rule on the Tongass is adversely affecting those businesses and thereby reducing the amount of business available to Southeast Stevedoring Corporation.

12. ALASKA ELECTRIC LIGHT & POWER (AEL&P) – Juneau's electricity comes from hydropower. AEL&P also supplies interruptible hydropower to the Greens Creek Mine, where hundreds of Juneau citizens work, and to cruise ships while docking in Juneau. The January 27, 2023,

reimposition of the 2001 Roadless Rule on the Tongass adversely impacts AEL&P because the certainty of road access is needed to construct future hydropower facilities in IRAs.

AEL&P's hydro projects and transmission lines are mostly surrounded by IRAs. Because roads are not available to access transmission lines for maintenance, repairs, and unscheduled outages, they must be serviced by helicopter. These helicopter maintenance costs are passed on to the ratepayers and are significant.

Among the negative impacts of the Roadless Rule to AEL&P customers:

a. The Roadless Rule is a limiting factor in developing and maintaining reliable power transmission lines in Southeast Alaska. During its avalanche mitigation studies, AEL&P had to eliminate mitigation options which were dependent on material and equipment access from tideline. Simply being able to pioneer a path for an excavator to track from tideline to the transmission line (~500') was not permittable, which prevented activities such as developing earthen berms around structures or positioning heavy wire reels for repairing damaged conductor. The alternative is to contract a very expensive heavy-lift helicopter, which more than doubles the cost of a project and limits design parameters due to weight limitations of helicopters. In addition, such helicopters are not readily available and potentially extend the period of repair and increase the use of backup diesel-powered generation. At times even if the heavy-lift helicopters are available, the weather conditions such as high winds, fog, or heavy snow prohibits flying.

b. The Roadless Rule significantly limits the ability to construct new power plants and transmission lines. Construction activities for new hydro power plants need road access from tideline to the resource site to transport materials and equipment. Not granting access severely restricts the development of future renewable energy resources for

Southeast Alaska. If the existing rule does not prohibit a project altogether, it may substantially increase the time and cost to develop the project, or worse, *make a proposed project uneconomic*.

c. The Roadless Rule could impact capital upgrades for existing projects. For example, if an existing penstock needs to be replaced, a road might be necessary if the replacement penstock is required to be buried. The Roadless Rule could preclude construction of the necessary road, which in turn could render the existing hydro project unusable. In such a situation, AEL&P would potentially be required to replace the power lost from that hydro project with diesel-generated power.

13. ALASKA POWER & TELEPHONE – AP&T has supplied affordable, reliable electrical power and telecommunication services throughout rural Alaska for almost 66 years. AP&T provides services within 21 Southeast communities, including Prince of Wales Island.

Due to the islanded status of AP&T's utility systems, there is a limited consumer base from which to support fixed utility system costs. When economic activity decreases and overall energy sales decrease, the total cost per kilowatt hour of energy required to support fixed costs increases. As load decreases due to a lack of or decrease in economic activity (both of which prompt outmigration), rates must rise.

Because of the small size of the utility systems AP&T serves, the closure of a key business (and potential ripple effects within the supply chain) can have an adverse impact on energy sales, and by extension AP&T's financial performance, and consumer rates. The 2001 Rule has

resulted in business closures. Its January 27, 2023, reimposition is threatening the closure of others, which would harm AP&T and its ratepayers.

AP&T's hydro projects and transmission lines are mostly surrounded by IRAs. Because roads are not available to access transmission lines for maintenance, repairs, and unscheduled outages, they must be serviced by helicopter. These helicopter maintenance costs are passed on to the ratepayers and are significant.

14. ALASKA MARINE LINES, INC. – AML is a marine transportation company that carries varieties of freight to and from Southeast Alaska in support of the mining, timber, renewable energy, tourism, and fishing industries. With the high fixed costs of operating a barge line, high freight volume is key to an efficient operation. Commercial activity, particularly hydro power development, mining, and fishing is essential to AML's ability to maintain affordable, frequent, and regular service to Southeast communities for other items such as groceries and other necessities of daily life, and materials for environmental remediation. The January 27, 2023, reimposition of the 2001 Roadless Rule on these businesses will adversely impact AML's ability to maintain affordable, frequent, and regular service to Southeast Alaska communities.

15. ALASKA MINERS' ASSOCIATION (AMA) – The Final Environmental Impact Statement (FEIS) for the 2008 Tongass Land and Resource Management Plan (TLMP) shows that the 2001 Roadless Rule increases the cost of mining exploration and development in the Tongass.

The 2008 TLMP FEIS pointed out that the U.S. Bureau of Mines had identified 148 locatable mineral deposits in the Tongass. Of these 52 were ranked as having the highest mineral potential. Seven were ranked as having the next highest potential and at least one "critical" and "strategic" mineral. (2008 FEIS at 3-356). In addition to the 148 Identified Mineral Deposits, the 2008 FEIS described 930 "Undiscovered Mineral Resource" tracts estimated in the 1991 United States Geologic Survey (USGS) Report.

The potential for many more high-paying mining jobs on the Tongass is enormous. The 1991 USGS study estimated a value for Discovered Minerals of $37.1 billion (expressed as 1988 dollars) and a value for Undiscovered Minerals of $28.3 billion (expressed as 1988 dollars). Obviously, the escalation in metals prices that has taken place between 1991 and 2008 has dramatically increased these numbers.

But the Tongass is being underexplored and developed because of the increased cost uncertainty caused by the 2001 Roadless Rule. Mining exploration and development is also adversely impacted by the lack of

certainty of road access and prohibition of the cutting of trees in IRAs due to the January 27, 2023, reimposition of the 2001 Roadless Rule. As the 2008 TLMP FEIS shows, the Roadless Rule causes significant extra costs and delays to obtain access authorizations to IRAs. Even then, such access may be limited to helicopter access, not road access.

16. HYAK MINING CO. INC. (HYAK) - The lack of certainty of road access and the inability to cut trees in IRAs caused by the January 27, 2023, reimposition of the Roadless Rule is adversely impacting Hyak's operations and its ability to explore for minerals on the Tongass.

17. RESOURCE DEVELOPMENT COUNCIL FOR ALASKA (RDC) – RDC is an Alaskan business association comprised of individuals and companies from Alaska's oil and gas, mining, forest products, tourism, renewable energy, and fisheries industries. RDC's purpose is to encourage a strong, diversified private sector in Alaska and expand the state's economic base through the responsible development of its natural resources.

The October 29, 2020, Rule that exempted the Tongass from the 2001 Roadless Rule provided an opportunity for the economy of Southeast (particularly the mining and hydropower sectors) to recover from the economic damage caused by the 2001 Rule. Conversely, the January 27, 2023, reimposition of the 2001 Roadless Rule is a major regulatory and

access barrier to the mining and hydropower industries going forward all of which will harm RDC's members.

18. ALASKA CHAMBER – The Alaska Chamber represents 100,000 Alaskan employees and businesses large and small. The mission of the Alaska Chamber is to grow and foster a healthy and diverse economy in Alaska. The Chamber has a strong interest in maintaining the October 29, 2020, Alaska-specific Rule exempting the Tongass from the 2001 Rule because it provides the opportunity for the economy of Southeast to recover from the economic damage created by the 2001 Rule over the last 10 years. Reimposition of the 2001 Roadless Rule is harming Chamber members.

19. ASSOCIATED GENERAL CONTRACTORS OF ALASKA (AGC of Alaska) – AGC of Alaska is the construction industry's largest professional trade association, representing over 600 general and specialty contractors and industry suppliers/service providers statewide. AGC facilitates cooperative and collaborative relationships between members, contractors, related construction industry professionals, governmental bodies, and other groups for responsible dealings with the public. Safety education is a high priority, reflecting the ever-present need in industry to keep jobsites incident-free and workers safe.

Many AGC members perform work in the Tongass National Forest in Southeast Alaska. Continuing commercial activity arising out of hydro power development and mining exploration and development on the Tongass Forest is therefore essential to AGC's members. AGC and its members are being harmed by the loss of commercial business activity resulting from the reimposition of the 2001 Roadless Rule.

20. JUNEAU CHAMBER OF COMMERCE - is a member organization representing just under 400 businesses in Juneau. The Juneau Chamber supports programs based on the proposition that tourism, fishing, mining, and hydropower can coexist to the benefit of all in the region. Reimposition of the 2001 Roadless Rule is adversely impacting the Juneau Chamber and its members in the mining and renewable resource industries. It is adversely affecting the recreational interests of all its members.

21. FIRST THINGS FIRST FOUNDATION (FTF) - FTF members engage in natural resource development activities and natural resource related jobs on the Tongass. The FTF and its members are being harmed by reimposition of the Roadless Rule due to the inability of the State and private industry to have access to, and develop, the abundant Tongass mining, renewable energy, and other natural resources.

22. TYLER RENTAL INC. - Tyler Rental Inc. is a full line rental equipment company serving the Southeast construction, timber, maritime and mining industries. Tyler Rental operates throughout Southeast Alaska including Ketchikan, Petersburg, Craig, Sitka, and Juneau. It employs 80 people in Southeast with a payroll of $5,174, 736 in 2020.

Commercial activity arising out of hydro power development, mining exploration, and development and fishing is essential to Tyler's ability to maintain affordable rental equipment for Southeast's communities. Tyler is being harmed by the loss of commercial business activity resulting from reimposition of the 2001 Roadless Rule.

23. FIRST BANK – First Bank's financial well-being depends upon a healthy economy in Southeast Alaska. First Bank has business relationships with many of the Plaintiffs in this Complaint and other resource dependent industries in Southeast Alaska. Accordingly, First Bank's business interests are being harmed by the adverse impacts on its customers caused by reimposition of the 2001 Rule.

24. TEMSCO HELICOPTERS, INC. - Temsco flies numerous items and personnel within Southeast Alaska in support of the mining, timber, energy, tourism, and fishing industries. Reimposition of the 2001 Roadless

Rule is reducing Temsco's ability to maintain affordable, frequent, and regular service to Southeast Alaska communities.

25. SAMSON TUG AND BARGE – Samson Tug and Barge is a family-owned business that carries multiple kinds of freight, and general consumer goods, to and from Southeast Alaska year-round in support of the mining, renewable energy, and fishing industries. Because of the high costs of operating a barge line, high volume is key to efficient operation. Reimposition of the 2001 Roadless Rule is reducing Samson's business and adversely impacting Samson's ability to maintain affordable, frequent, and regular service to Southeast communities.

26. BOYER TOWING INC - (BTI) is a marine transportation company that carries freight to and from Southeast Alaska in year-round support of its mining, renewable energy, tourism, and fishing industries. BTI also delivers the necessities and commodities of everyday life. Commercial activity, particularly timber harvest, hydropower development, mining, fishing, and tourism, is essential to BTI's ability to maintain affordable, frequent, and regular service to Southeast communities. Reimposition of the 2001 Roadless Rule is reducing BTI's business and adversely impacting BTI's ability to maintain affordable, frequent, and regular service to Southeast communities.

27. COASTAL HELICOPTERS  – Coastal Helicopters fly cargo and personnel in support of Southeast Alaska's mining, renewable energy, tourism, and fishing industries. Reimposition of the 2001 Rule on these businesses is adversely impacting Coastal's ability to maintain affordable, frequent, and regular service to Southeast Alaska communities and thereby damage Coastal' s business.

28. GREATER KETCHIKAN CHAMBER OF COMMERCE – The Ketchikan Chamber represents businesses engaged in the Ketchikan area's renewable energy, mining, fishing, and tourism industries. The 2001 Rule is a barrier to access to needed resources by the Chamber's members' businesses. There are significant adverse impacts on the Ketchikan Chamber and its resource industries members and on the recreational interests of its members because of reimposition of the 2001 Roadless Rule.

**Plaintiffs Have Standing to Challenge the January 27, 2003, Rule Reimposing the 2001 Roadless Rule on the Tongass.**

29. a. Plaintiffs have interests in the development of transportation, renewable energy development and powerline maintenance, mining exploration and development, fishing, tourism, and other natural resources on the Tongass National Forest.

b. Such development produces stable communities through high paying mining,[6] renewable energy, and other resource related jobs.

c. Such development generates local tax revenue to support Plaintiffs' and their employees and members children in the schools and secondary employment in Plaintiffs' businesses such as - road construction marine transportation of goods, the rental of equipment in support of such projects, financing of projects accessible by road, and development arising out of associated road construction.

d. Each of the Plaintiff local government and community associations, resource development associations, membership organizations, and businesses has citizens, members, employees, and shareholders who live and work in the Tongass National Forest for business, recreational, and other purposes. They use, and require road access to, the Tongass for economic and recreational purposes such as tourism, mining, timber harvest, construction of facilities needed to provide hydropower, and maintain transmission lines and other renewable energy opportunities to communities, and hiking, camping, and sport hunting, and fishing.

---

[6] For example, Rain Coast Data reports that in 2021 the mining industry provided 898 jobs and a payroll of $107 million Rain Coast Data. 2022 Southeast Alaska by the Numbers Report. Available at: https://www.seconference.org/southeast-alaska-by-the-numbers.

e. Plaintiffs participate actively in the administrative processes established for management of the Tongass and did so, including the submission of comments, during the process for the reimposition of the 2001 Roadless Rule on the Tongass. Plaintiffs have exhausted administrative remedies for the decision challenged in this Complaint.

30. a. The reimposition of the 2001 Roadless Rule on the Tongass on January 27, 2003, has erected barriers and impediments to Plaintiffs' ability to pursue their interests.

b. A decision declaring reimposition of the 2001 Roadless Rule on the Tongass on January 27, 2003, to be unlawful and unauthorized by Congress as alleged herein would remedy Plaintiffs' injuries by removing the barriers to economic development and recreation imposed by reimposition of the 2001 Roadless Rule on the Tongass on January 27, 2003.

31. Accordingly, the Plaintiffs have standing to bring this action.

**The Defendants**

32. Defendant Tom Vilsack is being sued in his official capacity as Secretary of Agriculture. The Secretary of Agriculture is the highest position within the United States Department of Agriculture and has ultimate responsibility for overseeing the Department and its agencies and ensuring

their compliance with all applicable federal laws. Defendant Vilsack is the official responsible for adopting the Rule and ROD challenged in this action.

33. a. Defendant United States Department of Agriculture (USDA) is an agency of the United States government, under the direction and control of the United States Secretary of Agriculture. The United States Department of Agriculture is the executive department responsible for overseeing the activities of the Forest Service. USDA enforces the Roadless Rule through the United States Forest Service, which is an agency within USDA.

b. Defendant United States Forest Service is the federal agency within USDA that is responsible for administering all applicable federal laws, and specific responsibilities related to the administration of the Tongass, including the Roadless Rule.

34. Defendant Xochitl Torres Small, is being sued in her official capacity as Deputy Secretary of Agriculture. The Deputy Secretary of Agriculture has responsibility for overseeing the Forest Service and ensuring its compliance with all applicable federal laws, and specific responsibilities related to the administration of the Tongass, including the Roadless Rule.

35. Defendant Randy Moore, is being sued in his official capacity as Chief of the United States Forest Service, the federal agency within USDA responsible for compliance with all applicable federal laws, and specific

responsibilities related to the administration of the Tongass, including the Roadless Rule.

## STATEMENT OF FACTS.

### The Tongass, ANILCA, the TTRA and the FY 2015 Defense Authorization Act

36. At nearly 17 million acres, the Tongass is the largest forest in the National Forest System - covering an area larger than West Virginia and one of the world's most important intact ecosystems. Thirty-two communities are located within the forest boundaries, with roughly 72,000 residents.

37. "Congress views Alaska as unique and [often] intends Alaska-specific laws to trump more general laws." *Wilderness Soc. v. U.S. Fish & Wildlife Serv.*, 316 F.3d 913, 928 (9th Cir. 2003). Three Alaska specific federal laws significantly affect management of the Tongass: the Alaska National Interest Lands Conservation Act (ANILCA), the Tongass Timber Reform Act (TTRA), and the Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015 (FY 2015 Defense Authorization Act).

a. In 1980, Congress passed ANILCA, which established more than 100 million acres of federal land across Alaska as new or expanded Conservation System Units (CSUs), including fourteen Wilderness Areas and two National Monuments in the Tongass.

Section 101(d) of ANILCA expresses the goal of the Congressional land set asides to provide "sufficient protection for the national interest in the scenic, natural, cultural and environmental values on the public lands in Alaska, and at the same time [provide] adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people."

b. In 1990, Congress passed TTRA which established six additional Wilderness Areas. In Title II of the TTRA Congress designated twelve areas of the Tongass as LUD II Special Management Areas (SMAs) which are to be "managed in a roadless state to retain their wildland character." In LUD II SMAs "Ecological processes and natural conditions are only minimally affected by past or current human uses or activities." In the October 29, 2020, ROD exempting the Tongass from the 2001 Roadless Rule, USDA made a determination that the LUD II SMAs are "substantially similar but slightly different" from IRAs in a manner that "does not make a meaningful difference to the level of conservation."[7]

c. The FY 2015 Defense Authorization Act finalized the outstanding Alaska Native Claims Settlement Act land entitlements of

_____

[7] 85 Fed. Reg. 68689, 68690 (Oct. 29, 2020).

Sealaska Regional Native Corporation and established eight additional LUD II SMAs in the Tongass.

d. The Congressionally designated Wilderness and LUD II SMAs, established and expanded through these laws, maintain the wilderness and roadless character of approximately 6.8 million acres of the Tongass, which is approximately 40% of the National Forest.

e. Defendants' designation of 9.34 million acres of the Tongass National Forest (Tongass) as Inventoried Roadless Areas (IRAs) (which are *de facto* LUD II SMAs) when added to the Congressional designations described in subsection (d) hereof sets aside 90% of the Tongass in unroaded status and arbitrarily and capriciously destroys the balance sought by Congress in Section 101(d) of ANILCA.

f. IRAs do not fall within the definition of "Conservation System Units" in ANILCA § 102 (4) and thus do not afford the access protections provided in ANILCA §§ 811, 1110 (a), 1110 (b).

38. Section 101(d) of ANILCA sets forth the goal of the Congressional land set asides to provide "sufficient protection for the national interest in the scenic, natural, cultural and environmental values on the public lands in Alaska, and at the same time [provide] adequate opportunity for satisfaction of the economic and social needs of the State of

Alaska and its people." Indeed, in its October 29, 2020, Rule that exempted the Tongass from the 2001 Roadless Rule, the USDA determined that the goals Congress set out in § 101(d) of ANILCA would be better achieved in the Tongass without the 2001 Roadless Rule: "The Tongass Forest Plan along with other conservation measures, will assure protection allowing roadless area values to prevail on the Tongass National Forest while offering additional flexibility to achieve other multiple use benefits."[8]

**History of the Application of the 2001 Roadless Rule to the Tongass**

39. In 2001 the Roadless Area Conservation Rule (Roadless Rule) was promulgated on all the National Forests in the United States. It was also applied to the National Forests in Alaska. It designated approximately 9.34 million acres (57%) of the Tongass National Forest (Tongass) as IRAs.

40. The 2001 Rule included a separate Tongass decision, but its general statement of Purpose and Need did not explain why a "national level, whole picture" review of the Tongass was needed given that, unlike any other national forest, two such reviews of the Tongass had been undertaken by Congress in ANILCA in 1980 and the TTRA in 1990. In short, Congressional enactment of ANILCA and the TTRA pre-empted and

---

[8] 85 Fed. Reg. 68688 (Oct. 29, 2020).

contradicted USDA's need for a "national" "whole picture" review of the Tongass. The Rule as promulgated did not take into account that Congress had balanced environmental values with economic and social needs on the Tongass. (See *Sturgeon v. Frost*, 139 S.Ct. 1066 (2019)).

41. Accordingly, then Alaska Governor, Tony Knowles, challenged application of the Rule to the National Forest in Alaska in 2001. Alaska's litigation asserted that denying or hindering road access to 9.34 million acres of IRAs violated the "No More" clause (§ 1326 (a)) of ANILCA. Finally, the State's litigation emphasized the adverse socioeconomic impacts of the Rule on communities in Southeast Alaska.

42. In 2003 then Alaska Governor Frank H. Murkowski settled the State's litigation based upon the commitment of USDA to engage in Tongass-specific rulemaking.

a. In December 2003 USDA acknowledged:

Approximately 90% of the 16.8 million acres in the Tongass National Forest is roadless and undeveloped. Over three-quarters (78% ) of these 16.8 million acres are either congressionally designated or managed under the forest plan as areas where timber harvest and road construction are not allowed.[9]

b. In December 2003 USDA agreed to temporarily exempt the Tongass from the Roadless Rule because "most Southeast Alaska

---

[9] 68 Fed. Reg. 75136, 75141 (Dec. 30, 2003).

communities are nearly surrounded on land by inventoried roadless areas of the Tongass, the Roadless Rule significantly limits the ability of communities to develop road and utility connections that almost all other communities in the United States takes for granted, and because "the roadless values on the Tongass are sufficiently protected under the Tongass Forest Plan and the additional restrictions associated with the roadless rule are not required."[10]

c. The 2003 Record of Decision stated:

The Department now believes that, considered together, the abundance of roadless values on the Tongass, the protection of roadless values included in the Tongass Forest Plan, and the socioeconomic costs to local communities of applying the roadless rule's prohibitions to the Tongass, all warrant treating the Tongass differently from the national forests outside of Alaska.[11]

d. The 2003 Regulation thus concluded:

The Department has concluded that the social and economic hardships to Southeast Alaska outweigh the potential long-term ecological benefits because the Tongass Forest plan adequately provides for the ecological sustainability of the Tongass.[12]

43. However, on March 4, 2011, the U.S. District Court for the District of Alaska issued an order vacating the 2003 Tongass Exemption and

---

[10] 68 Fed. Reg. 75136, 75139 (Dec. 30, 2003).
[11] *Id.*
[12] *Id.*

reinstating the 2001 Roadless Rule's application to the Tongass on the ground that the promulgation of the Tongass Exemption had arbitrarily and capriciously violated the APA.

44. A three-judge panel of the Ninth Circuit reversed the District Court and upheld the Exemption. But, in a 6 – 5 *en banc* decision in *Organized Village of Kake v. USDA*, 795 F.3d 956, 968 (9th Cir. 2015) the Ninth Circuit Court held that the 2003 Tongass Exemption was invalid because USDA failed to provide a reasoned explanation for contradicting the findings of the 2001 ROD and restored the 2001 Rule.

> The 2001 ROD explicitly found that wholly exempting the Tongass from the Roadless Rule and returning it to management under the Tongass Forest Plan "would risk the loss of important roadless area values," 66 Fed.Reg. at 3254, and that roadless values would be "lost or diminished" even by a limited exemption, *id*. at 3266. The 2003 ROD found in direct contradiction that the Roadless Rule was "unnecessary to maintain the roadless values," 68 Fed.Reg. at 75,137, and "the roadless values in the Tongass are sufficiently protected under the Tongass Forest Plan," *Id*. at 75,138.

45. In January 2018 then Alaska Governor, Bill Walker, petitioned USDA for an Alaska-specific Rule exempting the Tongass from the 2001 Rule. USDA agreed and proceeded to rulemaking which ended on September 24, 2020. USDA reviewed six alternatives during the NEPA process and selected total exemption from the 2001 Rule. The new Rule exempting the Tongass went into effect on October 29, 2020. The preamble

to the 2020 Alaska Roadless Rule stated: "The USDA and Forest Service believe that both roadless area conservation and other multiple-use values with important local socio-economic consequences are meaningfully addressed through local and regional forest planning on the Tongass, without the 2001 Roadless Rule prohibitions on timber harvest and road construction/reconstruction." (85 FR 68689, October 29, 2020).

46. On December 23, 2020, a group of environmental organizations filed a Complaint challenging USDA's October 29, 2020, Rule that exempted the Tongass from the 2001 Roadless Rule.

47. Prior to the commencement of litigation that addressed the environmental organizations' December 23, 2020, Complaint, on January 20, 2021, President Biden issued an Executive Order styled: "Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis."

a. Section 1 of the Executive Order directed immediate agency review to address regulations that conflicted with the incoming Administration's stated environmental policies.

b. Also on January 20, 2021, the White House issued a Fact Sheet that listed "Additional agency actions also will be reviewed to determine consistency with Section 1 of the Executive Order." USDA's October 29,

2020, Rule that exempted the Tongass from the 2001 Roadless Rule was first on the list for USDA to review.

48. On February 23, 2021, USDA requested the first of multiple stays of the litigation brought by environmental groups alleged in Paragraph 46 "to allow the Department of Agriculture time to review the Alaska Roadless Rule that is being challenged."

49. On November 23, 2021, the USDA published a notice of proposed rulemaking to repeal the October 29, 2020, Tongass Exemption which initiated a comment period that ended on January 24, 2022.

50. On January 27, 2023, USDA issued a Rule that repealed the October 29, 2020, Alaska Roadless Rule thereby reinstating the 2001 Roadless Rule on the Tongass.

**Effects of the Roadless Rule on the Tongass**

51. Reimposition of the 2001 Roadless Rule, administratively reimposes 9.34 million acres of "lasting" IRAs in the Tongass which are managed similarly to Congressionally designated LUD II SMAs and are in effect *de facto* LUD II SMAs. The reimposed 9.34 million acres of IRAs in the Tongass conflict with, and unnecessarily complicate, the management regime established by Congress for the Tongass in the following ways:

a. The reimposed 9.34 million acres of IRAs (*de facto* LUD II SMAs) significantly and adversely impact the mining, hydropower, and transportation sectors in the region by limiting access in and through remote areas of the Tongass, thereby increasing uncertainty, cost, and delay in the permitting processes, which have, in turn, negatively impacted Southeast Alaska communities and their economies and have thus significantly upset Congress's goal set out in ANILCA § 101 (d) to balance conservation with Southeast Alaska communities' social and economic needs.

b. Greater roaded connectivity among Southeast communities is necessary for community sustainability, but the reimposed 9.34 million acres of IRAs (*de facto* LUD II SMAs) present significant access and regulatory barriers to connecting communities in Southeast Alaska.

c. Electric utility and transportation sectors face significant access barriers from the 2001 Roadless Rule, affecting important infrastructure projects that would connect communities by roads, shorter ferry routes, and transmission lines maintained by roads.

d. Barriers to new hydroelectric facilities caused by reimposed 9.34 million acres of IRAs (*de facto* LUD II SMAs) prevent the replacement of diesel generated power in communities still on diesel power with renewable

energy, all of which contradicts the President's climate change/carbon emission policies.

e. The necessity of electric utilities to maintain electric transmission lines by helicopters instead of roads caused by the administrative reimposition of 9.34 million acres of "lasting" IRAs in the Tongass adds considerable expense to Southeast Alaska ratepayers' cost of electricity.

f. Surface access to mineral claims in IRAs (*de facto* LUD II SMAs) is limited by the 2001 Roadless Rule, which has impacted the timing, scope, and scale of mineral exploration in Southeast Alaska.

g. IRAs do not fall within the definition of "Conservation System Units" in ANILCA § 102 (4) and thus do not afford the access protections provided in ANILCA §§ 811, 1110 (a), and 1110 (b).

## CLAIMS FOR RELIEF

### FIRST CLAIM
### Not in Accordance with APA

52. a. Plaintiffs repeat and incorporate by reference the allegations of Paragraphs 1 through 51 of this Complaint.

b. A court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A),

in excess of statutory authority, *id.* § 706(2)(C), or "without observance of procedures required by law," *id.* § 706(2)(D).

53. USDA's October 29, 2020, Decision, which exempted the Tongass from the 2001 Roadless Rule, was based on the factual determination that the 2016 Tongass Forest Plan would adequately protect roadless values on the Tongass:

> The USDA and Forest Service believe that both roadless area conservation and other multiple-use values with important local socio-economic consequences are meaningfully addressed through local and regional forest planning on the Tongass, without the 2001 Roadless Rule prohibitions on timber harvest and road construction/reconstruction.[13]

54. Defendants' January 27, 2023, Decision, which reimposed the 2001 Roadless Rule on the Tongass, acknowledged that the USDA's October 29, 2020, Exemption of the Tongass had been based on the factual determination that the 2016 Tongass Forest Plan would adequately protect roadless values on the Tongass:

> At the time of the rulemaking in 2020, USDA stated that the land use designations, standards, and guidelines in the 2016 Tongass Land Management Forest Plan (2016 Forest Plan) along with other conservation measures, would assure protection of roadless values on the Tongass while offering modest additional flexibility to achieve other multiple use benefits.[14]

---

[13] 85 Fed. Reg. 68689 (Oct. 29, 2020).
[14] 88 Fed. Reg. 5252, 5253 (Jan. 27, 2023).

55. Nevertheless, Defendants "ignore[d] or countermand[ed] [these] earlier factual findings without a reasoned explanation for doing so," in violation of *Organized Village of Kake v. USDA*, 795 F.3d 956, 968 (9th Cir.2015) (*en banc*), when they changed policy in the January 27, 2023, Rule:

> By contrast, the USDA now believes that the adverse consequences of **exempting the Tongass from the 2001 Roadless Rule, particularly the increase in acreage available for timber production, the increase in road construction**, and the lack of consideration for the views of tribal nations, outweigh the benefits of decreasing federal regulation and the other advantages cited in the 2020 Alaska Roadless Rule.[15]  (Emphasis added).

This claim does not offer any explanation why protection of roadless values is no longer "meaningfully addressed through local and regional forest planning on the Tongass, without the 2001 Roadless Rule prohibitions on timber harvest and road construction/reconstruction" as USDA had asserted they would be in its October 29, 2020, Decision Exempting the Tongass.

56. The "increased timber production" justification in the January 27, 2023, Decision for reimposing the 2001 Roadless Rule on the Tongass "runs counter to the evidence" and is factually inconsistent with Defendants' admission in the January 27, 2023, Decision that the 2016 Forest Plan

---

[15]  88 Fed. Reg. 5252, 5255 (Jan. 27, 2023).

prohibition on timber sales in IRAs had not been lifted notwithstanding direction to do so in the October 29, 2020, Rule exempting the Tongass:

> As part of the Department's 2020 final rulemaking decision to exempt the Tongass from the 2001 Roadless Rule, the Department directed the Forest Service to issue a ministerial notice of an administrative change to the 2016 Forest Plan pursuant 36 CFR 219.13(c) to alter the timber suitability of lands deemed unsuitable solely due to the application of the 2001 Roadless Rule. **However, the ministerial administrative change was never issued, and no change has been made to the suitable lands designation in the 2016 Forest Plan.**[16] (Emphasis added).

57. Defendants' "increased timber production" justification in their January 27, 2023, Decision for reimposing the 2001 Roadless Rule on the Tongass violates the APA because it misled the public into supporting reimposition based on the non-existent threat of timber harvest and related roadbuilding.

a. At the time of their January 27, 2023, Decision Defendants knew that the 2016 Forest Plan had not been amended to allow timber harvest in IRAs and that "exempting the Tongass from the 2001 Roadless Rule (Alternative 6) would [**NOT**] make 168,000 more acres of old-growth forest available for timber production." But, notwithstanding the fact that the ministerial administrative change was never issued, Defendants misled the

---

[16] 88 Fed. Reg. 5252, 5261 (Jan. 27, 2023). (See also Page 5266).

public to believe that timber harvest and related roadbuilding would be allowed if Alternative 6 were implemented:

> As the USDA noted at the time, the 2020 FEIS estimates that exempting the Tongass from the 2001 Roadless Rule (Alternative 6) would make 168,000 more acres of old-growth forest available for timber production (FEIS at 3-18) and would result in nearly 46 miles of additional roads on NFS land over the next 100 years, compared with Alternative 1 (FEIS at 3-121).[17]

b. In fact, implementation of Alternative 6 would have had no effect on timber production and would have only affected renewable energy (hydropower and geothermal) and mining access. Because Defendants knew this at the time of their January 27, 2023, Decision, it was arbitrary and capricious for Defendants not to so inform the public, but to instead mislead the public by asserting the contrary to be true.

58. Defendants justified reimposing the 2001 Roadless Rule on the Tongass because:

> In particular, the USDA believes that Alternative 1 best addresses the needs and concerns of local communities, including Tribal communities. **These needs include the need for stability and predictability after over two decades of shifting management, which can be best served by restoring the familiar framework of the 2001 Roadless Rule.**[18] (Emphasis added).

---

[17] 88 Fed. Reg. 5252, 5255 (Jan. 27, 2023).

[18] *Id.*

This justification violates the APA because it is implausible for the same reason that the Court in *Organized Village of Kake* found almost the same statement in the 2003 Rule Exempting the Tongass to be implausible and in violation of the APA:

> The 2003 ROD states that "[a]dopting this final rule reduces the potential for conflicts regardless of the disposition of the various lawsuits" over the Roadless Rule. Id. at 75, 138.
>
> -        -        -        -
>
> [T]he Department could not have rationally expected that the Tongass Exemption would even have brought certainty to litigation about this particular forest. It predictably led to this lawsuit and did not even prevent a separate attack by Alaska on the Roadless Rule itself. At most, the Department deliberately traded one lawsuit for another.[19]

59.    Defendants' justification for reimposing the 2001 Roadless Rule on the Tongass because it is "more responsive to the vast majority of comments" violates the APA because it is implausible for the same reason that the Court in *Organized Village of Kake* found the same point made in the 2003 Rule to be implausible and in violation of the APA:

> The second of the three reasons given by the Department in the 2003 ROD for promulgating the Tongass Exemption was "comments received on the proposed rule." 68 Fed. Reg. at 75,137. But the 2003 ROD expressly conceded that these "comments raised no new issues" beyond those "already fully explored in the [Roadless Rule FEIS]." *Id.* at 75,139. It is implausible that comments raising "no new issues" regarding alternatives "already fully explored" motivated the adoption of the final Roadless Rule.[20]

---

[19] *Organized Village of Kake, supra*. at 968.

[20] *Id.*

Defendants did not identify any new issues raised in the comments or claim that there were any.

60. Updating U.S. Bureau of Mines and U.S.G.S. critical minerals studies from the 1970s, 1980s, and 1990s before reimposing the 2001 Roadless Rule was necessary for Defendants to know the impact on critical minerals that reimposition of the Roadless Rule would cost the country. Defendants' failure to update these reports, as requested by the State of Alaska, Senator Lisa Murkowski, and twenty Alaska organizations and associations in 2022, was arbitrary and capricious because Defendants failed to consider all the relevant factors before they acted to reimpose the 2001 Roadless Rule .

61. Reinstating application of the 2001 Roadless Rule on the Tongass prohibits road construction or reconstruction within the IRAs (*de facto* LUD II SMAs), with limited exceptions:[21]

a. Six of the seven exceptions to the prohibition on road construction or reconstruction within the IRAs (*de facto* LUD II SMAs) include "need" as a criterion on which the Responsible Official must base her/his determination of applicability. The only exception that is not needs based is

_____

[21] 36 C.F.R. § 294.12(b)1-7 and § 294.13(b)1-4

qualified with "… and no other reasonable and prudent alternative exists" (§ 294.12(b)(6)).

b. Making the exceptions "needs based" violates 16 U.S.C. § 524: which authorizes rights of way:

> Rights-of-way for the construction and maintenance of dams, reservoirs, water plants, ditches, flumes, pipes, tunnels, and canals, within and across the national forests of the United States, are granted to citizens and corporations of the United States for municipal or mining purposes, and for the purposes of the milling and reduction of ores, during the period of their beneficial use, under such rules and regulations as may be prescribed by the Secretary of the Interior, and subject to the laws of the State or Territory in which said forests are respectively situated.

Requiring helicopter access to mining claims and helicopter maintenance of hydropower dams and transmission lines is not in accordance with, and arbitrarily and capriciously conflicts with 16 U.S.C. § 524.

62. Defendants violated the APA by failing to consider the impacts of their January 27, 2023, reimposition decision on Plaintiffs' ability to develop renewable energy hydroelectric projects.

## SECOND CLAIM

### Not in Accordance with ANILCA § 708, TTRA, the FY 2015 Defense Authorization Act, and SAFETEA-LU § 4407

63. Plaintiffs repeat and incorporate by reference the allegations of Paragraphs 1 through 62 of this Complaint.

64. a. In ANILCA § 101(d), Congress determined that ANILCA'S

protection of "scenic, natural, cultural and environmental values" on Alaska lands resulted in the appropriate balance between protection and development and accordingly that "Congress believes that the need for future legislation designating new conservation units, new conservation areas, or new national recreation areas has been obviated thereby." Congress, thus, preempted any other "lasting" land designation by federal agency action because it could destroy the balance between protection and development that Congress reserved to itself.

b. Defendants nevertheless justified reimposing the 2001 Roadless Rule and 9.34 million acres of unroaded IRAs (*de facto* LUD II SMAs) withdrawals on the Tongass because :

> [T]he USDA believes that this alternative strikes the appropriate balances among the various values that the Department must consider when managing the Tongass. In particular, the USDA believes that Alternative 1 best addresses the needs and concerns of local communities, including Tribal communities. These needs include the need for stability and predictability after over two decades of shifting management, which can best be served by restoring the familiar framework of the 2001 Roadless Rule.[22]

i. Defendants further emphasized their intent to make the IRAs "lasting" unroaded withdrawals by admitting:

> The 2016 Forest Plan was designed to be consistent with the 2001 Roadless Rule, and in adopting the Plan, the Forest Supervisor

---

[22] 88 Fed. Reg. 5252, 5255 (Jan. 27, 2023).

concluded that "the best way to bring stability to the management of the roadless areas on the Tongass is to not recommend any modifications to the Roadless Rule." (2016 Forest Plan ROD at 4, 19)."[23]

So, just as "The intent of the 2001 Roadless Rule is to provide lasting protection for IRAs in the context of overall multiple use land management," the intent of the 2016 Forest Plan is to avoid changing the "lasting" withdrawals through a strategy of not changing the 2001 Roadless Rule.

ii. Defendants have thus arbitrarily and capriciously, and in violation of the APA (5 U.S.C. § 706(2)(C)), substituted their judgment for the amount of "lasting" land use designations required to "strike the appropriate balances among the various values" that Congress had decided in ANILCA and TTRA and the FY 2015 Defense Authorization Act to further its ANILCA § 101(d) policy goal of achieving "the appropriate balance between" protection and development.

c. By passage of ANILCA, TTRA, and the FY 2015 Defense Authorization Act, and especially its creation of LUD II SMAs in the TTRA in 1990, prior to Defendants promulgation of the 2001 Roadless Rule, Congress has demonstrated its clear and manifest intent that Congress, not the federal agencies, shall make the "lasting" land use designations in the

---

[23] *Id.*

Tongass National Forest necessary to achieve its ANILCA § 101 (d) goal of maintaining a balance between preservation and development.

d. These Congressional statutes, especially Congress's creation of LUD II SMAs in the TTRA, show that read together they preempt Defendants purported authority to designate "lasting" IRAs through agency regulation. (See *Sturgeon v. Frost*, 139 S.Ct. 1066 (2019)):

i. In ANILCA § 708(a)(2), a statute passed in 1980 that only applies to Alaska, Congress stated that it had made its own review and examination of National Forest system roadless areas in Alaska and of the environmental impacts associated with alternate allocations of such areas. In ANILCA § 708(b)(2) Congress stated that RARE II was "adequate consideration of the suitability of such lands for inclusion in the Wilderness System," all of which shows that Congress was fully aware of the amount of unroaded areas in the Tongass when it stated its ANILCA § 101 (d) goal of maintaining a balance between preservation and development.

ii. In Title II of the TTRA in 1990 Congress designated twelve areas as LUD II SMAs which are to be "managed in a roadless state to retain their wildland character." In LUD II SMAs "Ecological processes and natural conditions are only minimally affected by past

or current human uses or activities." In the October 29, 2020, ROD exempting the Tongass, USDA defined the LUD II SMAs as "substantially similar but slightly different" from IRAs in a manner that "does not make a meaningful difference to the level of conservation."[24]

iii. The FY 2015 Defense Authorization Act designated an additional eight areas as LUD II SMAs.[25]

iv. The "lasting" IRAs, promulgated and first applied by Defendants to the Tongass in 2001, mimic the unroaded protection and attempt to replicate the LUD II SMAs first established by Congress on the Tongass in 1990. Through reimposition of the Roadless Rule to the Tongass Defendants have added 8.5 million acres of *de facto* LUD II SMAs to the 878,694 acres that Congress actually devoted to LUD II SMAs without Congressional authority and in conflict with Congress's sole authority to "dispose of land" under Article IV, § 3, Clause 2 of the United States Constitution, all of which will upset the amount of unroaded areas of the Tongass that

---

[24] 85 Fed. Reg. 68689, 68690 (Oct. 29, 2020).
[25] There are thus a total of 878,694 acres on the Tongass that Congress has legislatively designated as LUD II SMAs.

Congress considered consistent with its ANILCA § 101 (d) goal of maintaining a balance between preservation and development.

e. By SAFETEA-LU § 4407[26] Congress designated 19 road and utility corridors in the Tongass, demonstrating that, notwithstanding Defendants' reimposition of the 2001 Roadless Rule to the Tongass, Congress sees the necessity for, and authorized, roadbuilding in the Tongass.

i. In an Order in *State of Alaska v. United States Forest Service*, Case No. 1:16-cv-00018, dated June 11, 2019, the Court observed:

> The Court DECLARES that Section 4407 established *in praesenti* property rights allowing Plaintiff's permanent access across National Forest System lands to construct, operate and maintain transportation and utility infrastructure to improve connections between the communities of southeast Alaska.

ii. Such 4407 roads and utility corridors are in addition to the easements and rights of way authorized in all national forests by 16 U.S.C. § 524, and in addition to the roads and trails Congress has said a national forest must have in 16 U.S.C. § 532.

f. That Congress enacted SAFETEA-LU § 4407, authorizing roads and utility corridors in the Tongass after promulgation of the 2001 Roadless

---

[26] Pub. L. No. 109-59 § 4407, 119 Stat. 1144, 1777, as amended by Pub. L. No. 114-94 § 1446(c), 129 Stat. 1312, 1438 ("Section 4407"). "SEC. 4407. RIGHTS-OF-WAY: "Notwithstanding any other provision of law, the reciprocal rights-of-way and easements identified on the map numbered 92337 and dated June 15, 2005, are hereby enacted into law."

Rule, and failed to amend 16 U.S.C. § 524 to preclude rights of way "for municipal or mining purposes" in the Tongass after promulgation of the 2001 Roadless Rule, demonstrates that Congress sought to exercise control over the amount of roadbuilding in the Tongass that would be consistent with achieving its ANILCA § 101 (d) prescription for the balance between preservation and development.

65. By their excessive and unreasonable designation of 9.34 million acres of IRAs (*de facto* LUD II SMAs) for "lasting" unroaded protection, which, when added to Congressional designations, sets aside 90% of the Tongass for "lasting" unroaded protection, Defendants have arbitrarily and capriciously interfered with, and illegally overridden, the foregoing actions taken by Congress's to achieve its ANILCA § 101(d) policy goal of achieving "the appropriate balance between protection and development," all of which violates the APA (5 U.S.C. § 706(2)(C)).

### THIRD CLAIM
### Not in Accordance with ANILCA "No More" Clauses

66. Plaintiffs repeat and incorporate by reference the allegations of Paragraphs 1 through 65 of this Complaint.

67. a. By ANILCA § 1326(a) Congress requires that, because it had explicitly determined and decided upon the appropriate balance between land to be set aside for "lasting" protection and land available for

development as stated in ANILCA § 101(d), Congress itself has to approve, by joint resolution, any further public land "withdrawal" in the Tongass in excess of 5,000 acres that would no longer be available for "more intensive use and disposition."

b. Defendants' intent "to provide lasting protection for IRAs in the context of overall multiple-use land management" and "not recommend any modifications to the Roadless Rule in the Forest Plan" makes IRAs functionally exempt from the public land laws through the 2001 Roadless Rule and the Forest Plan. Such IRAs larger than 5,000 acres are thus "withdrawals" not approved by Congress in violation of ANILCA § 1326(a).

68. By setting aside 9.34 million acres of IRAs in the Tongass for "lasting" protection without Congressional authorization, Defendants have violated §§ 101, 708, and 1326 of ANILCA.

## FOURTH CLAIM
### Defendants Have No Delegated Authority to
### Impose the 2001 Roadless Rule on the Tongass

69. Plaintiffs repeat and incorporate by reference the allegations of Paragraphs 1 through 68 of this Complaint.

70. The Organic Act and MUSYA authorize the Secretary to exercise limited and defined discretion to establish rules regulating access and use of national forests consistent with Congressional policy such as ANILCA, the

TTRA, and the FY 2015 Defense Authorization Act. The Secretary's discretion is limited to promulgating and enforcing rules that both (a) protect against the destruction or deterioration of natural resources, and (b) enable continued public access and reasonable economic or socially beneficial uses of the national forests.

71. Neither the Organic Administration Act (OAA) 16 U.S.C. § 475, nor the Multiple-Use Sustained-Yield Act (MUSYA) 16 U.S.C. §§ 528, 529, and 531 authorize, or delegate authority to, Defendants to deny access, and reasonable economic and socially beneficial uses over vast portions of the Tongass National Forest by adding "lasting" IRA protection for 9.34 million acres of the Tongass in addition to the designations made by Congress.

## FIFTH CLAIM
## Violation of Non-Delegation Doctrine

72. Plaintiffs repeat and incorporate by reference the allegations of Paragraphs 1 through 71 of this Complaint.

73. MUSYA does not provide an intelligible principle for Defendants to decide whether, and under what conditions, to deny road access to vast portions of the Tongass National Forest.

74. MUSYA does not "lay down an intelligible principle" with which USDA must conform in designating "lasting" IRAs on the Tongass National

Forest and thus violates the non-delegation doctrine as applied by Defendants.

75. If construed as conferring authority to make such designations MUSYA unconstitutionally conflicts with Congress's sole authority to "dispose of land" under Article IV, § 3, Clause 2 of the United States Constitution.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for judgment as follows:

a. A declaration that Defendants' January 27, 2023, decision to reimpose the 2001 Roadless Rule on the Tongass violates the APA.

b. A declaration that pursuant to ANILCA, TTRA, and the FY 2015 Defense Authorization Act only Congress, not federal agencies including Defendants, is authorized to make "lasting" land use designations in the Tongass National Forest and that Defendant attempt to do so violates separation of powers requirement of the United States Constitution.

c. A declaration that by setting aside 9.34 million acres of *de facto* LUD II SMAs ("lasting IRAs") in the Tongass without Congressional authorization, Defendants have altered the balance among conservation, subsistence, and economic and social needs manifested by Congressional

land designations in the Tongass and thereby violated §§ 101, 708, and 1326 of ANILCA.

d. A declaration that the Multiple-Use Sustained-Yield Act (MUSYA) 16 U.S.C. §§ 528, 529, and 531 does not provide an intelligible principle for Defendants to decide whether, and under what conditions, to deny road access to vast portions of the Tongass National Forest and that as applied by Defendants violates the non-delegation doctrine and separation of powers requirement of the United States Constitution.

e. An order invalidating and setting aside Defendants' January 27, 2023, decision to reimpose the 2001 Roadless Rule on the Tongass.

f. An order setting aside the January 27, 2023, ROD for the Reimposition of the 2001 Roadless Rule on the Tongass and stating that any actions taken by Defendants in reliance on the ROD are void.

g. An order providing such preliminary and permanent injunctive relief as needed to prevent or rescind and remedy any actions by Defendants in reliance on the January 27, 2023, ROD.

h. An award of costs incurred by Plaintiffs and such other fees as may be allowed by applicable law, including the Equal Access to Justice Act 28 U.S.C. § 2412.

i. Such other relief as the Court deems appropriate.

DATED this 8th day of September 2023.

/s/ Steven W. Silver                 /s/ James F. Clark
Steven W. Silver                   James F. Clark
Alaska Bar No. 7606089         Alaska Bar No. 6907025
Silver Legal Services, LLC      Law Offices of James F. Clark
2104 Polo Pointe Dr.             1109 C Street
Vienna, VA 22181              Juneau, Alaska 99801
703.527.4414 (office)          907.586.0122 (office)
703.587.7792 (cell)            907.723.6952 (cell)
ssilver628@aol.com            jfclarkiii@gmail.com